UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

UNITED STATES OF AMERICA,  )
                           )
                Plaintiffs,   )   Case No. 2:06-cr-00085-JCM-GWF
                           )
vs.                        )   **FINDINGS & RECOMMENDATIONS**
                           )
ROBERTO POPA, et al.,      )
                           )
                Defendants.   )
_____)

      This matter is before the Court on Defendant Roberto Popa's Motion for Severance (#97), filed on July 30, 2006; the United States' Response to Motion for Severance (#106), filed on August 11, 2006; and Roberto Popa's Reply to Government's Opposition to Motion for Severance (109), filed on August 15, 2006.   The Court conducted a hearing on this matter on September 14, 2006.

**FACTUAL BACKGROUND**

      Defendant POPA's Motion for Severance (#97) was brought in regard to the Superceding Indictment (#21) filed on March 21, 2006.  At the September 14th hearing on this matter, the Government stated that it is was in the process of submitting a Second Superceding Indictment to the grand jury.  The Second Superceding Indictment (#117) was subsequently filed on September 19, 2006. The material differences between the Superceding Indictment (#21) and the Second Superceding Indictment (#117) is the addition of three counts solely against Defendant POPA, charging him with making false statements in his applications for naturalization that he had never committed a crime or offense and that he unlawfully obtained naturalization and United States citizenship based on those

false statements. *See Second Superceding Indictment* (#117*),* Counts 12-14.   The Court will, therefore, analyze Defendant POPA's Motion for Severance (#97) based on the allegations and charges set forth in both the Superceding Indictment (#21) and the Second Superceding Indictment (#117).

Count One of the Second Superceding Indictment (#117) alleges that the defendants participated in a conspiracy to steal access devices (credit cards, debit cards, account numbers, and other access device identifiers) to obtain United States currency and other things of value.  Members of the conspiracy, acting individually or in teams, allegedly stole credit cards and debit cards from gym lockers and other locations where wallets and purses might be left unattended by the victims.   The stolen access devices would then be quickly forwarded to the leaders of the conspiracy, Defendants Stefan Naghiu and Marius Ciurea.  Defendants Naghiu and Ciurea, assisted by others, manufactured counterfeit drivers' licenses bearing the names of the authorized user, but containing the photograph of a conspiracy member, i.e. a "signer" or "runner."   The runners used or attempted to use the access device to obtain cash or other things of value.  Other members of the conspiracy allegedly monitored the runners' activities, provided counter-surveillance to guard against law enforcement or casino security, and assisted the runners in traveling from casino to casino to engage in these fraudulent transactions.  *Second Superceding Indictment* (#117)*,* ¶ ¶ 1-4.

The Second Superceding Indictment alleges that the conspiracy organization began in 1999 and was lead by Defendants Naghiu and Ciurea.  At that time, the conspiracy was allegedly centered in New York and was carried out predominantly in New Jersey and other locales in the eastern United States.  The Second Superceding Indictment alleges that in 1999, Defendant Naghiu and other confederates were arrested in Mississippi after they used stolen access devices to fraudulently obtain cash advances at casinos in that state.  *Second Superceding Indictment* (#117), ¶ 5.  The Second Superceding Indictment then alleges:

> 6.     Following the arrest or flight of their counterparts in Seattle, Washington, and Las Vegas, Nevada, Naghiu and Ciurea expanded the scope of their enterprise.  Beginning in 2002, Naghiu, Ciurea and their co-conspirators shifted the focus of their efforts toward Las Vegas.

*Id.*, ¶ 6.

The Second Superceding Indictment alleges that "[f]ollowing the conspiracies shift or expansion

toward Las Vegas," Defendant Niculescu and Vasile Tiganescu (not a defendant in this case) joined the conspiracy and agreed to provide stolen credit cards and debit cards for Naghiu and Ciurea's scheme. Defendant Niculescu was the leader of a team of credit card and debit card thieves based in and around Seattle, Washington." *Id.*, ¶ 7. The team members delivered the stolen credit cards and debit cards to Naghiu and Ciurea and that Naghiu, assisted by others, manufactured the counterfeit drivers' licenses provided to the runners. *Id.,* ¶ ¶ 8, 9.

The Second Superceding Indictment alleges specific incidents between June 20, 2002 and June 25, 2005 in which members of the conspiracy used stolen access devices to fraudulently obtain or attempt to obtain cash advances from casinos in Las Vegas. *Id.*, ¶ 11. Defendant POPA allegedly participated in such incidents on May 19, 2005; May 27, 2005; June 1, 2005; June 4, 2005; June 5, 2005; and June 25, 2005. *Id.*, ¶ 11 (i), (j), (l), (n), (o), and (r).

The Second Superceding Indictment alleges that another part of the conspiracy involved the conspirators devising a method in 2004 to steal or skim card numbers and electromagnetic identifiers from credit or debit cards, without permanently taking the physical credit or debit cards from the authorized cardholders, and that the conspirators also developing technology to manufacture "cloned" credit or debit cards which were used to fraudulently obtain cash in Las Vegas. The indictment does not allege that Defendant POPA specifically participated in this latter aspect of the conspiracy. *Second Superceding Indictment* (#117), ¶ 12.

Defendant POPA is charged with other defendants in Count Six, for traffic in and use of unauthorized access devices in violation of 18 U.S.C. §§ 1029(a)(2) and 1029(b)(1); and Count Seven, for fraudulent transactions with access devices issued to other persons during the one year period ending on June 30, 2005, in violation of 18 U.S.C. §§ 1029 (a)(5) and 1029(b)(1). POPA is also charged in Count Ten with wire fraud beginning not later than 1999 and continuing through June 2005 in violation of 18 U.S.C. §1343; and in Count Eleven, with use of means of identification of another during and in relation to enumerated offense during the period from July 15, 2004 through February 2006 in violation of 18 U.S.C. §1028A(a)(1).

Counts Twelve and Thirteen allege that during and after the time he allegedly participated in the conspiracy and committed the crimes charged in the Second Superceding Indictment, Defendant POPA

1  made false statements in his applications for naturalization that he had never committed any crime or
2  offense, in violation of 18 U.S.C. §1001.  Count Fourteen alleges that POPA unlawfully obtained
3  naturalization and United States citizenship by virtue of these false statements in violation of 18 U.S.C.
4  §1425(a).

## DISCUSSION

Fed.R.Crim Pro. 8(b) provides that an indictment may charge two or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.  The goal of Rule 8(b) is to maximize trial convenience and efficiency with a minimum of prejudice.  *United States v. Sarkisian*, 197 F.3d 966, 975 (9th Cir. 1999).  The rule is to be liberally construed in favor of initial joinder.  *Id., citing United States v. Ford*, 632 F.2d 1354, 1373 (9th Cir. 1980), *overruled on other grounds, United States v. DeBright,* 730 F.2d 1255, 1259 (9th Cir. 1984).  The test for initial joinder under Rule 8(b) is what is responsibly alleged, and not what is ultimately proved.  *See United States v. Morrow*, 39 F.3d 1228, 1237 (1st Cir. 1994), *cert. denied,* 115 S.Ct. 1328 (1995).  Where two or more defendants are indicted for a joint transaction, it is inadvisable to split up the case into many parts for separate trials, in the absence of very strong and cogent reasons.  *Davenport v. United States*, 260 F.2d 591, 594 (9th Cir. 1958).  *Davenport* states that this is especially true in conspiracy charges, from the very nature of the case.

Fed. R. Crim Pro. 14(a) provides that if joinder of offenses or defendants in an indictment for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials or provide any other relief that justice requires.  Severance under Rule 14(a) is discretionary.  *United States v. Lutz*, 621 F.2d 940, 945 (9th Cir. 1980).  Generally speaking, defendants jointly charged are to be jointly tried.  *United States v. Doe*, 655 F.2d 920, 926 (1981); United *States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir. 1980), *citing United States v. Gay*, 567 F.2d 916, 919 (9th Cir.), cert. denied, 435 U.S. 999, 98 S.Ct. 1655, 56 L.Ed.2d 90 (1978).  This is also the rule in conspiracy cases.  *Escalante, supra*, (citations omitted).  The prime consideration in assessing the prejudicial effect of a joint trial is whether the jury can reasonably be expected to compartmentalize

the evidence as it relates to separate defendants in view of its volume and the limited admissibility of some of the evidence.  *Escalante, supra*, *citing United States v. Brady*, 579 F.2d 1121, 1128 (9th Cir. 1978), cert denied 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979).  The prejudicial effect of evidence relating to the guilt of co-defendants is generally held to be neutralized by careful instructions by the trial judge.  *Id.* (citations omitted.)

Defendant's Motion asserts two grounds for severance under Rule 14(b).  First, Defendant argues that his co-defendants likely could offer exculpatory testimony for him at a separate trial, but will likely exercise their Fifth Amendment rights to remain silent if the defendants are tried together.  Second, Defendant argues that in a joint trial, he will likely be convicted based on guilt by association because many of the co-defendants were allegedly involved in the conspiracy for years, and the jury will be unable to distinguish Defendant POPA's allegedly minor and late involvement in the alleged conspiracy.

Underlying Defendant's argument is his contention that there was not a single conspiracy as charged in the indictment but, instead, two or three different conspiracies.  Defendant argues that at most, he can be charged with participating in the third conspiracy which allegedly involved the fraudulent use of access devices in Las Vegas in 2005.  At a joint trial, however, the jury will hear testimony by a cooperating Government witness, Florin Manea, about the other defendants' involvement in the prior conspiracy or conspiracies.  In a joint trial, Defendant argues that he will be unable to present exculpatory testimony from co-defendants that he had no involvement in the prior conspiracy(s) which will result in manifest injustice to Defendant POPA and likely cause in his conviction through guilt by association.

The Government, by contrast, argues that there was a single conspiracy that began in New York in 1999, was initially operated in New Jersey and the eastern United States, and was later transferred or expanded to Seattle, Washington and then to Las Vegas where Defendant POPA allegedly joined and committed acts in furtherance of the conspiracy.   The Government therefore argues that the defendants have been properly joined under Rule 8(b) and should be jointly tried.  At trial, evidence will be presented regarding the defendants' differing involvements in and acts committed in furtherance of the conspiracy.  The Government argues that any prejudice to Defendant POPA through admission of

5

1 evidence relating to the other defendants' participation in the conspiracy can be minimized through
2 careful jury instructions.
3   "The test of whether a single conspiracy existed, as opposed to multiple conspiracies, 'is
4 whether there was one overall agreement to perform various functions to achieve the objectives of the
5 conspiracy.'" *United States v. Otis, et.al.*, 127 F.3d 829, 835 (9th Cir. 1997), *quoting United States v.*
6 *Arbelaez*, 719 F.2d 1453, 1457 (9th Cir. 1983). *Arbelaez* further states that the general test
7 comprehends the existence of subgroups and subagreements. The evidence need not be such that it
8 excludes every hypothesis but that of a single conspiracy. Rather, it is enough that the evidence
9 adequately supports a finding that a single conspiracy existed. In determining whether a single
10 conspiracy existed, relevant areas of inquiry include the nature of the scheme, the identity of the
11 participants, the quality, frequency and duration of each conspirator's transactions and the commonality
12 of times and goals. *United States v. Arbelaez, supra,* 719 F.2d at 1457-58. Depending on the evidence
13 presented, there may be a jury question whether there was a single conspiracy or multiple conspiracies.
14 *United States v. Otis, et.al., supra.*
15   The Superceding and Second Superceding Indictments ("Indictment") in this case allege that the
16 conspiracy to steal credit and debit cards and manufacture counterfeit licenses to facilitate their
17 fraudulent use by the conspirators was formed in 1999 at which time it was centered in New York and
18 was led by Defendants Naghiu and Ciurea. According to the Indictment, the conspiracy operated
19 initially in New Jersey and the eastern United States. Thereafter, the conspiracy's base of operations
20 was transferred to Seattle, Washington, and beginning in 2002, Naghiu, Ciurea and their co-
21 conspirators shifted the focus of operations to Las Vegas. The Indictment alleges that the common
22 nature of the scheme was the organized theft of access devices, the manufacture of counterfeit drivers'
23 licenses and the use of runners and other confederates to operate the scheme. The Indictment alleges
24 that throughout its operation, including its later activities in Las Vegas, the conspiracy was led by
25 Naghiu and Ciurea who directed and supervised its operation. These allegations tend to support the
26 existence of a single conspiracy. The alleged length of the conspiracy and the fact that its alleged areas
27 of operation changed over time arguably supports a finding of more than a single conspiracy. Based on
28 the allegations set forth in the Indictment, the Government has sufficiently alleged a single conspiracy

to support joinder of all defendants in this Indictment.  *See United States v. Arbelaez, supra; United States v. Morrow*, 39 F.3d 1228, 1237 (1st Cir. 1994), *cert. denied,* 115 S.Ct. 1328 (1995).

According to paragraph 11 of the Second Superceding Indictment (#117), Defendant POPA actively participated in the conspiracy between May 19, 2005 and June 25, 2006 by using or attempting to use stolen credit or debit cards through counterfeit drivers' licenses bearing the rightful owner's name, but Defendant POPA's photograph.  According to the Government's Response, Defendant POPA was not a charter member of the conspiracy.  *Response* (#106), page 9.  Rather, the Government alleges that the available evidence indicates that POPA became involved in the conspiracy when it expanded into Nevada following the indictment of parallel organizations. *Id.*  The Government further states that Defendant POPA was not a leader or organizer of the conspiracy organization, and that he primarily acted as a member of teams designated to use stolen credit cards and counterfeit drivers' licenses in and around Las Vegas.  *Id.*  Nevertheless, the Government argues that Defendant POPA is vicariously liable for the substantive acts of his co-conspirators, whether or not he participated in those acts, so long as the acts were committed pursuant to and in furtherance of the conspiracy.  Further, a conspirator who joins a pre-existing conspiracy is bound by all that has gone before in the conspiracy.  *United States v. Saavedra*, 684 F.2d 1293, 1300 (1982); *United States v. Henson*, 123 F.3d 1226, 1234 (9th Cir. 1997).

**1.     Grounds For Severance Based on Exculpatory Testimony of Co-Defendants.**

In support of his Motion for Severance based on the need to present exculpatory testimony by his co-defendants, Defendant POPA asserts:

> Popa's co-defendants likely could offer exculpatory testimony for Popa at a separate trial, but will likely assert their Fifth Amendment right to remain silent if the defendants are tried together.  Upon a filing of an affidavit to this effect, Popa is entitled to severance of his case from that of his co-defendants.

*Defendant's Motion For Severance* (#97), page 3.

Defendant cites *United States v. Vigil*, 561 F.2d 1316 (9th Cir. 1977) and *United States v. Echeles*, 352 F.2d 892 (7th Cir. 1965).  In *Vigil,* the defendants were indicted and tried together for importing heroin and knowingly and intentionally possessing heroin with intent to distribute.  These charges arose out of a motor vehicle stop during which officers discovered heroin in the backseat of the vehicle where defendant Vigil was sitting.  Defendant Baca moved to sever his trial and have it

conducted after Vigil's trial. Baca's counsel submitted an affidavit stating that he had learned from Vigil's counsel that Vigil would willingly testify that Baca had no interest in the heroin and no knowledge of its presence. In a joint trial, however, Baca's counsel stated that Vigil would not be willing to testify because of his right against self-incrimination. Based on the affidavit of Baca's counsel, which was not contested by Vigil's counsel at the hearing on the motion to sever, the Court held that the trial court should have granted the motion to sever.

Defendant states that he reserves his right to provide the Court with an affidavit which satisfies the requirements of *Vigil*. Motion (#97), page 3. In his Reply (#109), Defendant further states that there are body recordings (obtained by a confidential informant) which indicate that the organizers of the conspiracy did not want to discuss matters in front of POPA. Defendant states that these recordings are in a foreign language (Romanian) and Defendant has not yet been provided with translated transcripts of the recordings. Apparently, it is Defendant's counsel's position that once he obtains translations of the recordings and determines that they contain exculpatory information, he will seek to call co-defendants to testify on his behalf and will submit an affidavit setting forth the nature of the exculpatory testimony and co-defendant's willingness to testify on POPA's behalf.

Defendant also argues that if his motion for severance is granted, his trial should not proceed until after the trial of the co-defendant(s) who may be willing to provide exculpatory testimony on his behalf so long as their trials proceed first and the defendant witnesses can testify on POPA's behalf without danger of incriminating themselves in regard to the charges pending against them. In support of his position, Defendant relies on *United States v. Tham*, 948 F.2d 1107 (9th Cir. 1991), *superceded by* 960 F.2d 1391 (9th Cir. 1992) and *United States v. Gay*, 567 F.2d 916, 921, n. 8 (9th Cir. 1978). Defendant POPA also argues that if the co-defendants refuse to voluntarily testify based on the exercise of their rights against self-incrimination, the Court should enter an order requiring the Government to grant the co-defendants use immunity under 18 U.S.C. § 6003(b)(1), or exercise its inherent judicial powers to confer immunity on the co-defendants to require them to testimony for Defendant. *United States v. Leonard*, 494 f.2 955, 985 n. 79 (D.C. Cir. 1974) (concurring and dissenting opinion of J. Bazelon); *Government of the Virgin Islands v. Smith*, 615 f.2d 964, 969-70 (3rd. Cir. 1980); *United States v. Alessio*, 528 f.2d 1029 (9th Cir. 1976).

In *United States v. Tham, supra*, the defendant submitted affidavits of his attorney and counsel for the co-defendants stating that the co-defendants were willing to provide exculpatory testimony on his behalf and requested that his trial be continued until after the severed trials of the co-defendants. The court noted that *dictum* in *United States v. Gay*, *supra*, suggested that it could be an abuse of discretion to grant severance based on defendant's intention to present exculpatory testimony by a co-defendant, but to then deny the moving defendant's request for a continuance which would have deterred the defendant witness from invoking his Fifth Amendment right. Other language in *Gay*, however, indicates that such a request for severance conditioned on the continuance of the movant's trial is grounds for denying the motion in order to prevent defendants from playing games with the court's trial schedule. *See also United States v. Little*, 753 F.2d 1420, 1446 (9th Cir. 1985). In *Tham*, the court found that defendant's assertion that his co-defendants would provide exculpatory testimony was not speculative or contingent. Nevertheless, the court affirmed the district court's denial of a continuance in part because the movant failed to demonstrate that the trial court granted severance based on exculpatory testimony to be provided by the co-defendants. In addition, the court found that the movant was able to present exculpatory testimony given by one of the co-defendants during his first trial and that the testimony of the other co-defendant was merely cumulative. Thus, the movant had failed to demonstrate that a continuance was necessary in order to present the exculpatory testimony.

In resolving the arguably conflicting statements in *Gay* regarding such conditional requests for severance and the court's subsequent statement in *United States v. Little, supra,* the court, in exercising its discretion, must first determine whether the moving defendant has met his burden of showing that such co-defendant exculpatory testimony is likely to be presented. *Little, supra*, 753 F.2d at 1446, states:

> Where, as here, the reason for severance is the asserted need of a codefendant's testimony, the moving defendant must show that he or she would call the codefendant at a severed trial, that the codefendant would, in fact, testify and that the testimony would be favorable to the moving defendant. In addition, the district court must consider the possible weight and credibility of the testimony and the economy of severance at the point the motion was made.

*See also United States v. Castro*, 887 F.2d 988, 998 (9th Cir. 1989).

In *United States v. Mariscal*, 939 F.2d 884, 885-86 (9th Cir. 1991), the court further states:

9

> In considering a defendant's claim that a codefendant will provide exculpatory testimony, a district court must weigh a number of factors, among them, "the good faith of the defendant's intent to have a codefendant testify, the possible weight and credibility of the predicted testimony, the probability that such testimony will materialize, [and] the economy of a joint trial." *United States v. Kaplan*, 554 F.2d 958, 966 (9th Cir.) (per curiam), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977).

*Mariscal* further held that "a district court must also consider the exculpatory nature and effect of the desired testimony – in other words, the *degree* to which the asserted codefendant testimony is exculpatory." *Id.* A showing that the testimony would merely contradict portions of the government's proof is not sufficient to require the court to grant a severance. *Id.*

Here, Defendant POPA has, at most, offered only speculation that co-defendants may be able to provide some exculpatory testimony. Defendant has not shown what the testimony will be or whether the co-defendants are willing to testify at a separate trial and whether their testimony will be favorable to him. The Government also argues that Defendant POPA will not be able to present exculpatory testimony because the Government will prove that Defendant POPA committed access device fraud and aggravated identity theft crimes charged in paragraph 11 of the Second Superceding Indictment and that he knowingly participated in the conspiracy during its later operation in Nevada. The Government also argues that consensual recordings by a confidential informant confirm Defendant POPA's participation in the conspiracy. It is thus arguable that the only exculpatory testimony that Defendant could present from the co-defendants is that he was not involved in the alleged conspiracy prior to 2005.

Without knowing what the nature of the proposed exculpatory testimony is, it is not possible for the Court to make the determination required under *Mariscal*. The Court, therefore, finds that Defendant POPA has not made the showing required under *Little* and *Castro, supra,* to support severance based on exculpatory testimony to be provided by co-defendants . Defendant's motion for severance on this ground should therefore be denied, without prejudice, to Defendant renewing his motion if he can satisfy the requirements under *Little, Castro* and *Mariscal, supra*. The Court should only consider Defendant's request to continue his trial if he demonstrates that severance is justified based on the need to present exculpatory testimony by a co-defendant(s).

. . .

1     For the same reason, Defendant's argument that the Court should require the Government to
2 grant use immunity to the co-defendants or exercise its inherent judicial power to grant use immunity to
3 co-defendants is also premature. *United States v. Alessio*, 528 F.2d 1079 (9th Cir. 1976), holds that the
4 decision to grant immunity is an executive function, and the court may not require the Government to
5 grant immunity to defense witnesses. The exception to this rule permits the court to order that such
6 immunity be granted upon defendant showing that (1) the testimony is relevant and (2) the government
7 intentionally distorted the judicial fact-finding process by denying immunity to the defendant's witness.
8 *United States v. Young*, 86 F.3d 944 (9th Cir. 1996). *See also United States v. Lord*, 711 F.2d 887, 891
9 (9th Cir. 1983); *Williams v. Woodford*, 384 F.3d 567, 600 (9th Cir. 2004). To satisfy the first prong, the
10 movant need only show the testimony sought is relevant. Although this showing is not high, as
11 discussed above, Defendant POPA has not yet shown what testimony the co-defendants would provide
12 if they were to voluntarily testify under a grant of immunity. Nor has he shown that such testimony, if
13 provided, would directly contradict the Government's witnesses or that it would be substantially
14 exculpatory.

15     To demonstrate prosecutorial misconduct of the second prong, Defendant must show that the
16 prosecution intentionally caused a defense witness to invoke the Fifth Amendment right against self-
17 incrimination, or that the prosecution granted immunity to a government witness in order to obtain that
18 witness's testimony, but denied immunity to a defense witness whose testimony would have directly
19 contradicted the government witness. *Williams v. Woodford, supra,* 384 F.3d at 600, *citing United*
20 *States v. Duran*, 189 F.3d 1071, 1087 (9th Cir. 1999). *See also  United States v. Lord, supra.*
21 Defendant POPA has not shown that the co-defendants will provide exculpatory testimony that benefits
22 his defense or which directly contradicts the testimony of a Government witness who has been granted
23 immunity. Nor has Defendant shown that the Government has intentionally distorted the fact-finding
24 process by causing witnesses to invoke their Fifth Amendment rights in order to discourage them from
25 testifying for Defendant.

26     **2.     Defendant's Claim that the Jury May Convict Him Through Guilt By Association.**

28     Defendant's argument that he is likely to be convicted through guilt by association is premised

11

on his argument that rather than there being one single conspiracy, there were, in fact, three separate and distinct conspiracies.  Thus, he claims that he will be unfairly prejudiced by the introduction of evidence, such as the testimony of the Government's witness Florin Manea, who was involved in the separate New Jersey and Pennsylvania conspiracy.  The Government argues, however, that there was, in fact, only one conspiracy that spanned the course of time from 1999 to 2006 and was operated in New York, New Jersey, other eastern states, Seattle, Washington and Las Vegas, Nevada.  The Government argues that even if Defendant POPA was tried separately, evidence of this conspiracy and the conduct of the other defendants prior to his joining the conspiracy would be admissible at trial against him. Any prejudice to defendant that might arise from evidence relating to co-defendants can be corrected by jury instructions that segregate the evidence and limit its applicability to each defendant.  *United States v. Vaccaro*, 816 f.2d 443, 448 (9th Cir. 1987), *cert. denied,* 484 U.S. 928, (1987); *United States v. Matta-Ballesteros,* 71 F.3d 754, 771 (9th Cir. 1995).

Because the Court finds that the Superceding Indictment and the Second Superceding Indictment sufficiently allege a single conspiracy, the Court finds that Defendant's motion for severance on this ground should be denied.  If, as the Government contends, the evidence supports a finding of a single conspiracy that Defendant POPA subsequently joined, then much of the evidence will be admissible at trial against him, regardless of whether he is jointly tried or separately tried.  The Court, however, is not precluded from revisiting the issue of severance at the time of trial if it determines as a matter of law that there were separate conspiracies and Defendant POPA was only a participate in the later conspiracy.

**CONCLUSION**

The Court finds that Defendant POPA has not set forth sufficient grounds to support granting his Motion for Severance based on his intent to present exculpatory testimony by co-defendants or that he will be unfairly prejudiced through the introduction of evidence regarding separate and/or prior conspiracies of which he was not a member.

**RECOMMENDATION**

**IT IS RECOMMENDED** that Defendant POPA's Motion for Severance (#97) be **Denied, without prejudice.**

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 27th day of September, 2006.

_____
GEORGE FOLEY, JR.
UNITED STATES MAGISTRATE JUDGE